# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-01-00444-CV

### Delia A. Bandy, Appellant

### v.

### Paul A. White, D.C. and Nutrition Center, Inc., d/b/a Nutri-West, Appellees

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT**
**NO. 99-01701, HONORABLE SCOTT H. JENKINS, JUDGE PRESIDING**

After a two-week trial in a defamation suit filed by Delia Bandy, a jury failed to find in Ms. Bandy=s favor and found that the appellees had established that the allegedly defamatory statements were true or substantially true and protected by a qualified privilege. On appeal, appellant challenges the jury=s failure to find that the statements constituted libel or libel *per se* and attacks the evidentiary support for the jury=s findings regarding the affirmative defenses of truth and privilege. She also complains about the trial court=s refusal to strike one of appellees= exhibits. We will affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Delia Bandy, also known as AJody Bandy,@ sold nutritional supplements that were manufactured and distributed by a Wyoming company called Nutrition Center, Inc. d/b/a Nutri-West. The

company, which markets its supplements specifically to chiropractors for their patients=needs, was founded by Dr. Paul White, who was himself a chiropractor. Prior to launching Nutri-West, Dr. White had been involved in two nutritional supplement companies that failed, he believed, because the distributors did not have exclusive franchises and competed against each other for the same customers, creating Adistributors wars.@ Therefore, Dr. White determined to succeed with Nutri-West by granting distributors the exclusive right to sell products within a certain geographical area. For example, Ms. Bandy had a contract with Nutri-West that gave her the exclusive right to sell the company=s products in Texas from 1992 to 1997. The dozen or so other distributors likewise had exclusive territories. Exclusive distributorships were the ethos of the Nutri-West business, and Dr. White, who ran the business with his wife and son, did not tolerate violations of this principle. Dr. White frequently emphasized to Nutri-West distributors that the success of the company depended on the distributors= ability to trust one another not to sell supplements outside their territory.

The policy did more than breed goodwill among the distributors; it also gave each distributor an economic incentive to develop a market for Nutri-West products in an exclusive territory. According to their agreements with the company, distributors were required to promote the supplements in their assigned area by arranging seminars at which well-known people in the chiropractic community would speak, sending out mailings and e-mails, visiting doctors= offices to drop off literature, and Acold-calling@ doctors= offices located within their assigned territory. Each distributor bore the costs associated with the marketing of Nutri-West products in his area. One of Dr. White=s witnesses, Ronald Hinkley, who had been a Nutri-West distributor for thirteen years, testified that it would not have been profitable for him to

spend money on the required marketing in his territory only to have distributors from outside his territory capitalize on his efforts. Ben Markham, another long-time distributor for Nutri-West, testified that the value of his distributorship was based on its exclusivity. A more recent distributor agreed that having the exclusive rights to a territory affected how much he was willing to spend to grow his franchise. All of the long-term distributors testified that they had always considered themselves exclusive distributors within their assigned territories; they added that selling outside one=s territory was considered dishonest and unscrupulous and violated the principles on which the company operated. As Ben Markham testified, the one thing that was considered unethical within the company was for a Nutri-West distributor to sell outside his assigned territory.

Moreover, Dr. White deemed such action to be a serious violation of the distributorship contract, and he frequently reminded his sales force of the prohibition on out-of-territory sales. Several Nutri-West distributors testified that they were aware that Dr. White did not tolerate any violations of the exclusivity policy; when he learned that a distributor was selling into another=s territory, Dr. White acted swiftly to sanction the distributor and deter further violations. Such incidents also prompted Dr. White to send Adistributor bulletins,@ in which he cautioned the distributors that such behavior would not be tolerated. In fact, Dr. White testified that at Ms. Bandy=s request, he had enforced the policy against a distributor whom Ms. Bandy suspected of selling in her assigned territory. So strongly held was Dr. White=s conviction that out-of-territory sales effectively Acheated@ the rightful distributor out of a sale, that it was the company=s practice for a violator caught poaching to turn over the account and proceeds from any sales to the territory=s assigned distributor. In addition, the violator faced possible termination of his contract.

**3**

Ms. Bandy, who incorporated her Texas franchise under the name Nutri-West Texas, had increasing sales throughout her five-year contract. In 1996, she was named the distributor with the largest percentage increase in sales and received a $5000 prize. Increasingly, however, Ms. Bandy=s business became marred by difficulties. The home office in Wyoming logged numerous complaints by customers who reported that they had unsuccessfully tried to contact Ms. Bandy or her staff at Nutri-West Texas, even though each distributor was required to have an operational 1-800 number and maintain an office. Other customers complained that they were treated rudely by those in her office. In addition to the complaints by customers, the home office experienced problems of its own in dealing with Ms. Bandy. The home office had so many problems with Ms. Bandy=s payment for products, including numerous bounced checks, that it ordered the staff to send all shipments to Nutri-West Texas AC.O.D.@ Dr. White also testified that the office often had to make Adrop ships,@ or ship products directly to Ms. Bandy=s customers, because Ms. Bandy did not have the money to pay the C.O.D. charges. In addition, Ms. Bandy=s sales fell from the high of $440,000 in 1996 to less than $400,000 in 1997. Dr. White testified that he and his staff were initially patient with Ms. Bandy and attempted to resolve the problems, but near the end of her contract term, Dr. White informed Ms. Bandy that she should find a buyer to acquire her business as Nutri-West would not renew her contract for another term.

Ms. Bandy subsequently made arrangements with Ken Connolly, a chiropractor, and his wife Tracey to buy the business for $450,000; this price approximated Ms. Bandy=s total sales of $440,000 in the previous year. Dr. Connolly testified that while he and his wife were already attracted by the idea of taking over the Nutri-West business, their trip to Wyoming to visit the home office and discuss the business

opportunity with Dr. White and his wife increased their enthusiasm regarding the venture. After returning to Texas, Dr. Connolly suggested a few revisions to the agreement with Ms. Bandy, based on his conversations with Dr. White, and the parties closed on the deal in December 1997. He testified that the parties structured the $450,000 sales price as follows: $150,000 due in full at the time of closing, representing the distributorship, plus a promissory note for $300,000, representing the value of Ms. Bandy=s promise not to compete. Under their agreement, Ms. Bandy was required to provide the Connollys with her customer list.

Soon after the closing, however, disputes arose. The Connollys began receiving calls from doctors outside Texas seeking to Are-order@ Nutri-West supplements. Dr. Connolly testified that he and his wife believed they were restricted to selling supplements to doctors who resided in Texas. They contacted Dr. White, who asked them to prepare a list of the out-of-state doctors who had requested supplements. Dr. Connolly also testified that Ms. Bandy had represented to him that she had approximately one thousand current clients, but he soon discovered they numbered only three hundred, and fifty of these resided outside the state and were thus off-limits. These disputes ultimately led to a modification of the sales contract: Ms. Bandy agreed to reduce the $300,000 note by half, and in exchange Dr. Connolly released Ms. Bandy from the non-compete agreement.

Meanwhile, the Connollys= dispute with Ms. Bandy had alerted Dr. White to the persistent problem of out-of-territory sales. This was not the first time that Ms. Bandy had violated the company policy. Alex Storrie, a seventeen-year distributor, testified that he became aware in 1994 that Ms. Bandy was selling products in his territory, which included Oklahoma, Kansas and part of Missouri. At that time,

Ms. Bandy gave him a list of twenty doctors in Oklahoma to whom she had been selling and stated that, as was the customary practice, she was turning the twenty accounts over to him. Despite her promise, the same twenty doctors appeared on the list of out-of-state customers that the Connollys prepared in 1998 for Dr. White. Ben Markham, distributor for the region including Arizona, New Mexico, Utah, and Nevada, also discovered that Ms. Bandy had sold to doctors in his territory. He testified that he called and informed her that he considered her to be Astealing@ from him, and requested that she send him all of her invoices of sales to doctors in his territory. She sent him the invoices and a check for approximately $150. He testified that when he looked at the invoices that Ms. Bandy prepared for this litigation, he realized that she had actually sold thousands of dollars in products to doctors located in his territory.

When this same pattern surrounding Ms. Bandy=s distributorship practices came to light in connection with the Connollys, Dr. White felt compelled to address the subject with his current distributors. At trial, several witnesses testified that Dr. White was a plain-spoken man who, although kind and generous, was also quick-tempered; when it came to the founding principle of his company, he was known not to mince words. In February 1998, he characteristically faxed a routine, if caustic, reminder to the fourteen distributors reiterating his position that there were to be no out-of-territory sales. The letter follows:

Re: Selling outside of assigned territory

How would you like to purchase a territory, with the purchase price based on current sales and then find out that a large number of said sales were derived outside of the territory? This is what happened in Texas. To make matters worse, I am now finding out that a number of the distributors that were cheated knew about it and were protecting Jody

**6**

Bandy because they felt sorry for her. So far I have found fifty doctors that she was selling outside of her distributorship and the number is growing. Twenty-one in Oklahoma alone. This tells me how well the areas are being covered by you. The only territories that she was not selling in are St. Louis and England.

The spin-off of this dishonesty is far reaching:

1. I found a doctor in Arkansas that she has been selling for three years. This doctor called Texas to order and the new distributor, playing by the rules, must tell the doctor that he has been dealing with dishonest people. That doctor is mad because he has to buy from a distributor further away and is threatening to quit Nutri-West.

2. Keep in mind that Jody won the $5000.00 prize last year based at least in part on sales in your territories.

3. What must the new distributor think? Ill tell you what they think, AThat they are dealing with a bunch of thieves@!

4. What do I think? Maybe this is not an isolated case? AI won=t tell on you, if you don=t tell on me?@

5. This is probably going to gravitate into a lawsuit.

6. If a person can sell to your twenty-one customers for up to three years without you discovering it something is very wrong.

Jody cheated Nutri-West, you, the new distributor and me. She also made us all look foolish and helped us loose [sic] our good reputation and some of you helped her do it. I want you all to know that I am not happy about it! You know the old Wyoming saying, Ayou lay down with pigs, you get up smelling like garbage.@

Be aware that an addendum will be forthcoming, addressing this issue and new contracts will contain teeth that will not allow this to happen. Further, when any and all distributorships are sold, a statement will be contained therein that binds all parties to the fact that all revenue must be derived within the boundaries of the territory and if not, the contract is null and void.

I have addressed this issue dozens of times in the past to each and every one of you. I guess no one believed me. I am here to tell you that if you are, or you are aware of

**7**

distributors selling outside of their territory, now is the time to report it to the home office. Failure to do so will be dealt with very severely.

Sincerely,
Paul A. White, D.C., President


At trial, the parties stipulated that Dr. White sent the letter to the fourteen existing Nutri-West distributors, including Ken and Tracey Connolly, and that the Connollys were the Anew distributors@ referenced in the letter. Ms. Bandy, who was no longer a Nutri-West distributor, learned of the letter several months later. Ms. Bandy filed suit alleging that the letter constituted libel and libel *per se*.[1] Dr. White and Nutri-West responded with a general denial and also asserted the affirmative defenses of truth and qualified privilege. After two weeks of testimony and hundreds of exhibits, the jury returned a verdict in favor of the defendants on all issues.

Specifically, the jury found that the February 1998 letter was not libel *per se*, that Dr. White did not libel Ms. Bandy by publishing the letter, that the statements in the letter concerning Ms. Bandy were true or substantially true, that the statements concerned a subject matter in which Dr. White and the recipients had a common business interest or duty and thus the statements were privileged, and that Dr.

---

[1] During the course of litigation, Ms. Bandy amended her pleadings to assert a cause of action against Dr. White for tortious interference with contract arising out of the same factual nexus as her claim for defamation. The jury failed to find in Ms. Bandy=s favor on this issue and she does not present such failure among her grounds for this appeal.

White did not act with malice in publishing the letter. Based on the jury=s findings, the court rendered a final take-nothing judgment in favor of the defendants. On appeal, Ms. Bandy urges that the trial court erred by failing to grant her motion for directed verdict and by refusing to grant her motion to disregard jury findings and for judgment notwithstanding the verdict. In support of the latter, Ms. Bandy asserts that she established libel and libel *per se* as a matter of law. Ms. Bandy also urges that the evidence was legally insufficient to support the jury=s findings that Dr. White established his affirmative defenses of truth or substantial truth and of qualified privilege. In addition, she challenges the evidentiary support for the jury=s failure to find that Dr. White acted with actual malice. Finally, Ms. Bandy urges that it was reversible error for the trial court to refuse to strike one of Dr. White=s exhibits.

## DISCUSSION

A statement is defamatory if it tends to injure the person=s reputation and thereby expose the person to public hatred, contempt or ridicule, or financial injury or if it tends to impeach that person=s honesty, integrity, or virtue. Tex. Civ. Prac. & Rem. Code Ann. ' 73.001 (West 1997); *Abbott v. Pollock*, 946 S.W.2d 513, 519 (Tex. App.CAustin 1997, writ denied). Publication of defamatory words means to communicate orally, in writing, or in print to a third person capable of understanding their defamatory import and in such a way that the third person does so understand. *Pollock*, 946 S.W.2d at 519. A cause of action for libel arises when one publishes a false defamatory statement of fact of and concerning another and the one publishing the statement was at fault. *Id.* It is the plaintiff=s burden to prove the falsity of the complained of statement. *KTRK Television v. Felder*, 950 S.W.2d 100, 105 (Tex.

App.C Houston [14th Dist.] 1997, no pet.).  Conversely, the affirmative defense of truth or substantial truth is a complete defense to a defamation claim.[2]  *See* Tex. Civ. Prac. & Rem. Code Ann. ' 73.005; *Randall=s Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex. 1995).  To prevail on his affirmative defense, Dr. White had the burden to prove the truth of the allegedly defamatory statements.  *See Tatum v. Liner*, 749 S.W.2d 251, 256 (Tex. App.C San Antonio 1988, no writ).  A defendant need not establish that the statement is literally true; rather, a showing that the statements are substantially true suffices to defeat a claim for libel.  *See Stephens v. Delhi Gas Pipeline Corp.*, 924 S.W.2d 765, 769 (Tex. App.C Texarkana 1996, writ denied).  To determine whether the statements in the February letter were substantially true, we must consider whether the allegedly defamatory statements were more damaging to Ms. Bandy=s reputation, in the mind of the average listener, than truthful statements about her would have been.  *See Swate v. Schiffers*, 975 S.W.2d 70, 75 (Tex. App.C San Antonio 1998, pet. denied).  Moreover, in making this inquiry, we focus on the Agist@ of the letter rather than each sentence in isolation.  *See id.*

*Evidence that the Statements Were Substantially True*

---

[2]  Section 73.005 of the Civil Practice & Remedies Code and much of the case law declare truth or substantial truth an affirmative defense to a defamation claim.  In this case, the result is the same whether truth is an affirmative defense or merely negates the essential element of falsity.  We will discuss substantial truth in the context of an affirmative defense as the parties have briefed it.

**10**

Ms. Bandy urges that the evidence is legally insufficient to sustain the jury=s finding that the letter was substantially true. Because she did not have the burden of proof on this affirmative defense, her burden on appeal is to demonstrate that there is no evidence to support the jury=s finding. *See Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983). In reviewing no-evidence points of error, we must consider all of the record evidence in a light most favorable to the party in whose favor the verdict was rendered, and every reasonable inference deducible from the evidence is to be indulged in that party=s favor. *Formosa Plastics Corp. USA v. Presidio Eng=rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998) (citing *Harbin v. Seale*, 461 S.W.2d 591, 592 (Tex. 1970)). Anything more than a scintilla of evidence is legally sufficient to support the finding. *Id.* If there is any evidence of probative force to support the finding, the no-evidence issue must be overruled and the finding upheld. *ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997).

Dr. White argued that the gist of the letter, when read in the context of the Nutri-West ethos, was his characterization of Ms. Bandy=s conduct and its effect on the company he had founded. The jury heard abundant evidence that the purpose of the letter was to alert the distributors to the company=s intolerance of out-of-territory sales and that Dr. White referred to this recent situation to demonstrate the rationale behind his unwavering policy. He showed how a new distributor who was trying to play by the rules had brought to light an embarrassing revelation about the cover-ups going on among some Nutri-West distributors. Dr. White testified that he felt compelled to address the subject with the distributors and that his purpose in sending the letter was to discipline his distributors, not to libel Ms. Bandy, who was no longer associated with the company.

**11**

Ms. Bandy alleged, however, that Dr. White deliberately made false statements about her and thereby damaged her reputation. At trial, she admitted that she had sold Nutri-West products outside of her assigned territory, but testified that she believed she had a right to sell the products anywhere she wished. Despite the overwhelming evidence that all of the other Nutri-West distributors knew that selling out of area was both dishonest and in violation of their contracts and of company policy, Ms. Bandy maintained that she believed that she was not limited to selling the products in her assigned territory. Ms. Bandy's main focus at trial was on her contract for 1992 to 1997, which failed to include the term "exclusive" to describe her sales territory. The defendants responded that the contract nevertheless gave her the right to distribute products only in Texas. The "Appointment" clause states: "Subject to the terms and conditions herein contained, Nutri-West hereby appoints Distributor [Ms. Bandy] as a distributor of the Products in the territory described in Exhibit A." Exhibit A to the contract states: "Distributor territory consists of the state of Texas." In addition, the contract stated: "Distributor shall restrict sales to health care practitioners licensed to diagnosis [sic], or upon the order of a health care practitioner to laymen located within the Distributor's assigned territory."

The defendants also emphasized that the contract uses the term "assigned territory" no less than sixteen times in connection with the mutual duties of Nutri-West and Ms. Bandy. For example, the contract states that Nutri-West agrees to "advertise, at its expense, in national professional journals, and periodically mail advertising literature, or other promotional material to customers and prospects *within the assigned territory*." (Emphasis added.) It also states, "The Distributor shall establish and maintain a place of business and adequate distribution facilities to properly service the customers *in the assigned territory*."

**12**

(Emphasis added.) The contract, according to Dr. White, clearly bestowed distribution rights only in Ms. Bandy=s Aassigned territory@ of Texas and nowhere else. In fact, defense counsel=s cross-examination of Ms. Bandy revealed that she initially interpreted her contract the same way as Dr. White, and that only at trial did she espouse the non-exclusive interpretation of the agreement.

Ms. Bandy continues to assert on appeal that the contract did not expressly prohibit her from selling outside the assigned territory, and argues that the trial court Aapplied the wrong legal standard to the conduct in question@ because the contract unambiguously allowed her to make out-of-territory sales. Ms. Bandy=s arguments regarding the contract are misguided. First, no party asserted a breach of contract claim; therefore, neither the court nor the jury was called upon to interpret the contract.[3] Second, Ms. Bandy=s interpretation of her contract at trial was inconsistent with the position she had taken earlier in the litigation. During her cross-examination, defense counsel reminded Ms. Bandy that she had agreed during her deposition that under her contract, Texas was her exclusive territory. Moreover, even if Ms. Bandy=s sales outside Texas had not violated the literal terms of her contract, she admitted in her deposition that as far back as 1985, when she and her former husband operated a Nutri-West distributorship in the Carolinas

---

[3] Similarly, Ms. Bandy=s arguments that Nutri-West=s interpretation of the contract amounts to an illegal restraint of trade and calls for an implied covenant are misplaced. The court was not asked to interpret or enforce the contract, which had been terminated for several years at the time of trial. Moreover, regardless of her interpretation of the contract, she acknowledged through her words and conduct that she understood that selling outside her territory was inconsistent with her agreement with Nutri-West. Finally, based on our review of the record, it appears that Ms. Bandy failed to assert these arguments before or during the trial; instead, she raised them in her post-trial motions for judgment notwithstanding the verdict and for a new trial. This fact is an additional reason why we need not address her arguments on appeal. *See* Tex. R. App. P. 33.1.

13

and several other states, she had understood the policy of the company to prohibit out-of-territory sales. She was also presented with her deposition testimony in which she agreed that if she sold Nutri-West supplements outside of Texas, she would be lying and cheating other distributors.

Ms. Bandy=s testimony that she was allowed to sell Nutri-West products anywhere was inconsistent with the testimony of Dr. White and several other distributors. Her trial position was in also sharp contrast to the way she ran her Nutri-West Texas business. The defense introduced press releases from 1996 in which Ms. Bandy touted her distributorship as the Aexclusive distributor in the State of Texas for the full line nutritional supplements manufactured by Nutri-West, Inc.@ In addition, Dr. White testified that Ms. Bandy had called on him to protect her exclusive distributorship when she discovered Bob and Betty Gibson selling products to a doctor in Texas. At her request, Dr. White wrote a letter to the Gibsons warning them that Athere will be NO shipping out of your territory unless an agreement has been made with the distributor that is agreeable to both parties.@ Dr. White emphasized: AThere will be NO deviation in any of these rules. I simply cannot have a distributors war taking place.@ Ms. Bandy received a copy of the letter issued to protect her exclusive territory. The record contains overwhelming evidence that Ms. Bandy knew of the exclusivity principle and violated it, and this supports the jury=s finding that the gist of the February letter, which concerned Dr. White=s characterization of Ms. Bandy=s conduct when she owned the Texas distributorship, was substantially true.

Ms. Bandy, however, focuses on certain statements in isolation and asserts that the evidence of the truth of each statement is legally insufficient. Even if the jury had been required to find that each isolated statement was true, Dr. White presented legally sufficient evidence about the truth of all of the

**14**

statements contained in the letter. For example, Ms. Bandy asserts that the letter accuses her of dishonesty, cheating, and thievery. Ms. Bandy was confronted on the stand with her own deposition testimony in which she agreed that selling Nutri-West products outside her territory was dishonest and cheated other distributors out of their rightful sales. Long-time distributors Ben Markham, Alex Storrie, and Ronald Hinkley testified that they believed such conduct was dishonest and threatened the stability of the company. Dr. White testified that he had always considered a distributor who sold outside her assigned territory to be dishonest. The evidence presented by the defense clearly reflected this long-held belief. Indeed, the 1985 letter that he wrote to the Gibsons echoes the February 1998 letter that Dr. White sent to all the distributors. In 1985, he wrote:

> We will not tolerate the beginning of such actions, as they cause dissention [sic] and mistrust among all distributors. This company is going to be run on trust and truth . . . . I am really terribly disappointed in all of this, as it has been discussed a number of times. I sincerely hope that it can be settled. The problem is, that sometimes things like this destroys all former trust. We must all work together and we will succeed. If we work against each other we will fail . . . it is just that simple.

There was abundant evidence that would support a finding that statements characterizing out-of-territory sales as dishonest and cheating were substantially true in the milieu and ethos of this company. Ms. Bandy asserts that to believe that her actions were dishonest, the jury had to have found that she had intended to defraud the other distributors or Nutri-West. This argument overlooks the fact that in a defamation case, the defendant need not prove the literal truth of his statements; rather, proof that the statements are substantially true, or true in their factual context, is a complete defense to a claim for

**15**

defamation. Ms. Bandy also focuses on the reference in the letter to thievery, asserting that it charges her with criminal conduct: AWhat must the new distributor think? I=ll tell you what they think, >That they are dealing with a bunch of thieves!=@ As Dr. White testified at trial, he was not referring in that statement to Ms. Bandy but to the then-existing distributors, a group that no longer included Ms. Bandy.

She next complains that the evidence does not establish the truth of Dr. White=s characterization of her transaction with the Connollys as one in which the purchase price was based on her total annual sales. Ms. Bandy testified that the original amount of the sale, $450,000, was Anon-negotiable@ and she denied that this sales price was derived from her gross sales. Dr. Connolly also testified that she represented that the price was non-negotiable, but that to determine if $450,000 was a reasonable price for the business, he had looked at her total sales for the previous year. Moreover, her sales for that year, roughly $440,000, closely approximated her asking price. Therefore, the evidence supports a finding that Dr. White=s description of the transaction was substantially true.

Likewise, there is legally sufficient evidence to support a finding that the statement regarding the $5000 prize was substantially truthful: AKeep in mind that Jody won the $5000.00 prize last year based at least in part on sales in your territories.@ Tony White, Dr. White=s son and the current president of Nutri-West, Inc., testified that he is responsible for calculating the prize. He explained that the prize is based on all sales, which would include prohibited out-of-territory sales. Dr. Connolly testified that in determining the prize for largest percentage increase in sales, all sales are taken into account; therefore, if a significant amount of sales are out-of-territory, the numbers used to determine the winner could be skewed. The evidence indicated that Ms. Bandy had made more than a few isolated sales outside Texas. Although

**16**

Nutri-West was unable to come up with precise figures, due in part to Ms. Bandy=s failure to provide business records for most of the relevant period and in part to Tony White=s somewhat imprecise calculations, the evidence was undisputed that Ms. Bandy had made many sales to doctors located outside Texas.[4] If even one out-of-territory sale had been included in the calculations to determine the prize, Dr. White=s statement could be considered substantially true.

The record is replete with probative evidence that supports the jury=s finding that Dr. White=s letter was true or substantially true. Because truth is a complete defense to a defamation claim, we need not address Ms. Bandy=s additional argument regarding the jury=s failure to find that Dr. White lost his qualified privilege by acting with actual malice. Because the evidence is legally sufficient to support Dr. White=s affirmative defense, we overrule Ms. Bandy=s first, second, and third issues.

### Admission of Summary Document

In her fourth issue, Ms. Bandy argues that the court erred in refusing to strike a document that Tony White prepared regarding the $5000 prize. We review a trial court=s decision to admit or exclude evidence for an abuse of discretion. *See City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex. 1995). Even if we find that the court erred, we must still find that the error was reasonably calculated to

---

[4] Ms. Bandy testified that she sold in Nevada, Arkansas, Oklahoma, New Mexico, Pennsylvania, and Utah. Tony White testified that based on the invoices she provided, she made approximately $38,000 in prohibited sales in 1996-1997.

cause and probably did cause rendition of an improper judgment. *See* Tex. R. App. P. 44.1(a)(1); *Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex. 1989). A person seeking to reverse a judgment based on evidentiary error need not show that but for the error a different judgment would necessarily have been rendered. *Alvarado*, 897 S.W.2d at 753. A successful challenge to evidentiary rulings, however, usually requires the complaining party to show that the judgment turns on the particular evidence excluded or admitted. *Id.* at 753-54. We must review the entire record to determine whether the error was indeed harmful. *See McCraw v. Maris*, 828 S.W.2d 756, 758 (Tex. 1992).

The document was based on the invoices that Ms. Bandy provided in the course of litigation and was intended to show how her out-of-territory sales helped her to win the $5000 prize. When defense counsel offered the exhibit, Ms. Bandy=s attorney briefly examined White, the document=s maker, on voir dire. Counsel inquired whether the summaries and charts accurately reflected the invoices, whether the totals were accurate, and whether there was any double-counting. Apparently satisfied with White=s responses, counsel for Ms. Bandy affirmatively stated that he had no objection to the evidence. On cross-examination, counsel=s interrogation of White revealed some discrepancies and double counting in the document=s totals. Counsel then moved to strike the exhibit on the ground that it was not an accurate summary of the underlying documents. The court denied the request. On appeal, Ms. Bandy asserts that the court erred in refusing to strike the document because it did not comply with the requisites of rule of evidence 1006. *See* Tex. R. Evid. 1006 (requiring that evidence admitted in summary form be based on otherwise admissible evidence).

**18**

It is clear from the record that counsel=s arguments were not directed at the inadmissibility of the underlying business records, which Ms. Bandy herself provided, but rather at White=s methodology in calculating her total out-of-territory sales. Moreover, counsel affirmatively stated that he had Ano objection@ to the document when it was introduced and he even used the evidence on cross-examination to point out the discrepancies in the calculations. As the trial judge remarked in overruling the motion to strike, by the time counsel made the motion he had effectively Aeviscerat[ed]@ the credibility of the document. Because counsel made a calculated move to allow the document in evidence and then attack it in front of the jury during his cross-examination of White, we hold that Ms. Bandy waived the issue on appeal. Accordingly we overrule her fourth issue.

## CONCLUSION

Having overruled all of Ms. Bandy=s issues on appeal, we affirm the trial court=s take-nothing judgment.

Bea Ann Smith, Justice

Before Chief Justice Aboussie, Justices B. A. Smith and Yeakel

Affirmed

Filed: July 26, 2002

Do Not Publish

19