**KTRK TELEVISION d/b/a KTRK–TV, Minerva Perez, and Shara Fryer, Appellants,**

**v.**

**Bettye FELDER and the Houston Resource Learning Center, Inc., Appellees.**

**No. 14–96–00310–CV.**

Court of Appeals of Texas, Houston (14th Dist.).

April 10, 1997.

Charles L. Babcock, N. David Bleisch, Susan Weiss Davidson, for appellants.

Laurence W. Watts, Carla S. Danbury, for appellees.

Before MURPHY, C.J., and ANDERSON and O'NEILL, JJ.

## OPINION

MURPHY, Chief Justice.

This is an interlocutory appeal by media defendants from the denial of a motion for summary judgment in a defamation case. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(6) (Vernon Supp.1997). Bettye Felder sued KTRK Television, Inc. d/b/a KTRK–TV and two of its reporters, Minerva Perez and Shara Fryer (collectively referred to as "KTRK"), alleging she was defamed by a January 6, 1994, news broadcast ("the Broadcast"). The Broadcast reported allegations by parents of students that Felder, a Dowling Middle School teacher, had physically threatened and verbally abused their chil-

dren. It also reported that Felder was going to be reassigned pending an investigation of the matter by the Houston Independent School District ("HISD"). Felder's private tutoring business, Houston Resource Reading & Learning Center, Inc. ("Houston Resource"), intervened in the suit claiming its business was damaged by the alleged defamatory broadcast. KTRK moved for summary judgment on a variety of constitutional, statutory, and common law grounds. Without stating the basis for its ruling, the trial court denied KTRK's motion and KTRK appealed. We reverse the trial court's order and render judgment that Felder and Houston Resource take nothing.

## I. FACTS

### A. The Incidents

There are several incidents in late 1993 that are the basis for the story aired by KTRK. At the time, Felder, a former special education teacher of elementary school students, had just transferred to Dowling Middle School. Although she was not accustomed to working with middle school children, Felder requested the transfer because of a conflict with an elementary school principal. At Dowling, Felder taught English to "resource students," who needed special attention because of behavioral problems or learning deficiencies. The first incident occurred when the parents of one of Felder's eighth-grade students complained to Joseph Drayton, then the Assistant Superintendent for the HISD South Area Office, that Felder had threatened to shoot their son with a gun, which the child claimed was in Felder's purse. After being confronted by Dowling's principal, Richard Gardner, Felder denied making such a threat or possessing a gun, but stated she had a large sum of cash in her purse which necessitated her keeping her purse nearby at all times. She opened her purse for Gardner, who did not see a gun.

The second incident occurred when a parent complained to Superintendent Drayton that Felder threatened to "body-slam" her daughter, a sixth-grader, if she did not leave the classroom. In a previous incident, that same parent had accused Felder of choking her son, but had resolved the matter with Felder. Once again, Principal Gardner investigated. As a result of that investigation, Mr. Gardner issued a written reprimand to Felder for her "negative unprofessional comments." A fourth incident involved a claim by an eighth-grade student that Felder threatened him with a pair of scissors. In a written statement, Felder later claimed she was not "conscious" of the scissors in her hand and that the student had verbally threatened her when she asked him to leave the classroom due to disruptive behavior.

As a result of this last incident, the student was suspended and a hearing on the matter was scheduled on the Dowling campus. On the scheduled date, the hearing was initially delayed for the arrival of a union representative as per Felder's request. When she subsequently learned that several of the complaining parents and students were going to be at the hearing, Felder requested another delay so that she could be represented by a union attorney. Ultimately, the hearing never took place because Gayle Fallon, the President of the Houston Federation of Teachers, arrived and received permission to remove Felder from the campus. Felder was immediately reassigned and never returned to Dowling.

### B. The Story

KTRK reporter, Minerva Perez, was first notified about the allegations concerning Felder at approximately mid-morning on January 6, 1994, by Rose Ayala, a parent active in school affairs at Dowling. In the past, Ms. Ayala had called Perez on other stories about Dowling and Perez believed her to be a reliable source. Following her conversation with Ms. Ayala, Perez interviewed several parents of Dowling Middle School students, including the PTA president, Mildred Burnley. They told Perez that Felder had threatened their children with physical harm. After these interviews, Perez called the official spokesperson for HISD, Jaime De La Isla. Unable to reach Mr. De La Isla, Perez spoke to Vernell Jessie, who stated she would call Perez back. When Perez asked Ms. Jessie if she could reach Felder, she was

told Felder could not be contacted through HISD.

Later that morning, Ms. Jessie informed the KTRK news desk that Mr. De La Isla would be available to meet with Perez. Around lunchtime, Perez met with Mr. De La Isla at HISD headquarters. Mr. De La Isla stated the administration was going to temporarily reassign Felder under the supervision of the area superintendent pending the outcome of an investigation on the matter. When Perez asked for Felder's home telephone number and a photograph of Felder, Mr. De La Isla refused to provide them. At this time, Perez attempted to contact Gayle Fallon. Ms. Fallon, however, was in a meeting and unavailable. Sometime after lunch, Perez went back to Dowling Middle School to speak to Principal Gardner to obtain Felder's home telephone number. Perez asked two school officials for permission to speak to Mr. Gardner but was barred from entering the school.

### C. The Broadcast

Following her investigation, Perez wrote the script for her report and submitted it to the executive producer and producer for approval. The executive producer had been kept informed of the investigation's progress throughout the day by Perez. After the script was approved, Perez tracked it on videotape and gave it to the editors. The following report headlined KTRK's January 6, 1994, broadcast:

**Shara Fryer:** Dowling Middle School, which has a history of discipline and personnel problems is once again in the middle of a controversy. A group of parents, including the PTA President, is charging a school teacher with physically threatening and verbally abusing their kids. As Minerva Perez reports, they want that teacher and the principal removed.

**Lucille Taylor:** And then she told him, asked him maybe two or three times, and the third time he got up and he started walking out the door and uh, he said she said something to him, and he turned around and when he turned around, she come up with the scissors like that and told him you better get out of this room boy.

**Ester Thompson:** About three days after he was in her class, she choked him. He has a problem, and if you provoke him, he will get violent. She choked him.

**Minerva Perez:** Those are the allegations against Dowling Middle School teacher Bettye Felder, whom we couldn't reach for comment today. These parents say they have had enough of her questionable behavior in her special ed class. Even the PTA President is siding with the parents.

**Mildred Burnley:** And then to go and talk to HISD, and they inform me that the same teacher had done similar, and they understood what I was going through. To say that they understand is not enough, and we're not going to sit back and take it over here.

**Perez:** When attempts were made to reach Principal Richard Gardner today, this reporter wasn't even given the courtesy to reach his campus office.

**Unidentified Woman:** He came out and told you that we would not be making comments today.

**Perez:** He didn't tell me.

**Unidentified Woman:** Here he is right here.

**Man:** Mr. Gardner has gone to a meeting.

**Unidentified Woman:** We are going to ask that you leave.

**Perez:** You're not Mr. Gardner?

**Unidentified Woman:** You are already exciting our kids.

**Perez:** You are very excited ma'am. All I want to do is talk to this man. Now is Mr. Gardner here?

**Unidentified Woman:** We have no comment.

**Perez:** Dowling for years has seen enough people with discipline and administration problems. These latest allegations are just another round. But school officials say they have already taken action.

**Jaime De La Isla:** The administration is determined to reassign this individual temporarily under the supervision of the area superintendent, certainly pending the outcome of the investigation.

**Perez:** But until the problem is resolved, parents say they are prepared to file a lawsuit against the district for what they call inadequate teachers and administrators at Dowling Middle School. Minerva Perez 13 Eyewitness News.

### D. The Follow–Up

The next day, Perez interviewed Gayle Fallon at Fallon's office. Perez asked Ms. Fallon for Felder's telephone number but Fallon refused, saying that she could not release personnel records. A portion of the Fallon interview headlined KTRK's January 7, 1994, news broadcast. That broadcast essentially reported Ms. Fallon's view that Felder was incapable of choking a child and it was Felder who was being threatened by the students. Neither Felder nor Houston Resource complain about this broadcast. In fact, in their pleadings, Felder and Houston Resource characterize the January 7, 1994, broadcast as a "retraction."

### E. The HISD Investigation

HISD subsequently investigated the incidents concerning Felder. On March 2, 1994, the HISD Office of Professional Standards issued a Personnel Investigation Report ("the HISD report"). That report documented that Felder had an inordinate amount of discipline problems with her students. However, of the incidents giving rise to the investigation, the HISD report confirmed only the incident in which Felder threatened to body-slam a student.[1] This incident was not specifically mentioned in the Broadcast and as we described, Felder was reprimanded for her conduct.

### F. This Suit

On October 3, 1994, Felder filed suit, asserting causes of action for libel and slander, false light invasion of privacy, negligence, and intentional infliction of emotional distress based on the January 6, 1994 broadcast. On

March 17, 1995, Houston Resource intervened asserting causes of action for business disparagement, injurious falsehood, and tortious interference with a business relationship based on the Broadcast. In November 1995, KTRK moved for summary judgment on all claims asserted by Felder and Houston Resource. Specifically, KTRK asserted Felder's defamation claim failed as a matter of law because the Broadcast was substantially true or privileged. Alternatively, KTRK asserted Felder was a limited public figure or public official and the summary judgment proof conclusively showed the absence of actual malice by KTRK in airing the Broadcast. KTRK further asserted the other causes of action alleged by both Felder and Houston Resource were founded entirely on Felder's defamation claim and because that claim failed as a matter of law, so did these other causes of action.

After Felder and Houston Resource filed their response, KTRK filed briefs in support of its motion as well as objections to the summary judgment proof offered by Felder and Houston Resource. At a hearing on January 5, 1996, the trial court took matters under advisement and requested additional briefing by the parties concerning the Texas Supreme Court's opinion in *McIlvain v. Jacobs,* 794 S.W.2d 14 (Tex.1990). Pursuant to the court's request, the parties filed reply briefs. In its reply, KTRK also asked the court to rule on its summary judgment motion and motion to strike summary judgment proof. The trial court eventually denied KTRK's motion for summary judgment on February 8, 1996. It did not rule on KTRK's objections, however, until March 14, 1996, after KTRK perfected this appeal. The trial court overruled most of these objections but sustained objections to portions of Felder's deposition testimony and struck the expert report on damages submitted by Felder and Houston Resource.

---

1. HISD investigated two other alleged incidents. One was an allegation by Felder that students verbally threatened to assault her. The other was an allegation that Felder closed a classroom door on a student's hand. In its report, HISD noted that "none of the persons interviewed had any knowledge of this [latter] incident." Indeed,

in that report, HISD concluded both of these allegations, as well as the "gun" allegation, could not be confirmed "due to lack of evidence." Further, Superintendent Drayton testified that he found no evidence to support the "scissors" allegation and was not aware of any fact finding by HISD regarding this allegation.

## II. ANALYSIS

In fourteen points of error, KTRK contends the trial court erred in denying it summary judgment on each of the claims asserted by Felder and Houston Resource.

### A. The Standard

■ Point of error one complains generally that the trial court erred in denying KTRK's motion for summary judgment. Even though courts must give careful judicial attention to summary judgment motions in the context of the First Amendment, the standard for reviewing summary judgment is the same in defamation cases as in other types of case. *Simmons v. Ware*, 920 S.W.2d 438, 443 (Tex.App.—Amarillo 1996, no writ) (citing *Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex.1989)). That standard is well-established. A movant for summary judgment has the burden of showing there is no genuine issue of material fact and it is entitled to judgment as a matter of law. *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548–49 (Tex.1985); *Montgomery v. Kennedy*, 669 S.W.2d 309, 310–11 (Tex.1984). In deciding whether there is a disputed material fact issue precluding summary judgment, proof favorable to the non-movant is taken as true and the court must indulge every reasonable inference and resolve any doubts in favor of the non-movant. *Nixon* 690 S.W.2d at 548–49; *Montgomery*, 669 S.W.2d at 310.

■ In other words, the issue on appeal is not whether the non-movant raised a material issue of fact precluding summary judgment; rather, the issue is whether the movant proved it was entitled to judgment as a matter of law. *See* Tex.R. Civ. P. 166a(c); *Gibbs v. General Motors Corp.*, 450 S.W.2d 827, 828–29 (Tex.1970). If the appellate court finds the movant has not met its burden, it must reverse and remand the case for further proceedings. *Gibbs*, 450 S.W.2d at 828–29. To prevail on summary judgment, a defendant, as the movant, must establish as a matter of law all the elements of an affirmative defense or show that that at least one

element of plaintiff's cause of action has been established conclusively against the plaintiff. *Montgomery*, 669 S.W.2d at 310–11; *Gibbs*, 450 S.W.2d at 828. When, as in this case, the trial court does not specify the ground upon which it based its ruling, the summary judgment will be affirmed on appeal if any of the theories advanced are meritorious. *Carr*, 776 S.W.2d at 569; *Simmons*, 920 S.W.2d at 443.

### B. Felder's Defamation Claim

■ Generally, to recover on a claim for defamation, the plaintiff must prove the defendant published a false defamatory statement to a third-party about the plaintiff. *See Clarke v. Denton Publishing Co.*, 793 S.W.2d 329, 331 (Tex.App.—Fort Worth 1990, writ denied). As we stated, KTRK sought to negate essential elements of Felder's claim by asserting that the Broadcast was substantially true, and alternatively, that Felder was a public figure and/or public official and the summary judgment proof conclusively showed the absence of actual malice. *McIlvain*, 794 S.W.2d at 15 (holding that private figure plaintiff must bear burden of showing the speech at issue is false before recovering damages for defamation from media defendant);[2] *see also Carr*, 776 S.W.2d at 569 (stating the elements of defamation cause of action brought by public official or public figure). KTRK also asserted the defense of privilege. Tex. Civ. Prac. & Rem.Code Ann. §§ 73.002 (Vernon 1986). Because the truth issue raised by KTRK in point of error two is dispositive of this appeal, we address it first.

■ In determining the truth or falsity of an allegedly defamatory broadcast, Texas uses the "substantial truth" test. *McIlvain*, 794 S.W.2d at 16. That test involves consideration of whether the alleged defamatory statement was more damaging to the plaintiff's reputation in the mind of the average listener than a truthful statement would have been. *McIlvain*, 794 S.W.2d at 16. This evaluation involves looking to the "gist" of the broadcast. *Id.* If the underlying facts

---

2. Section 73.005 of the Civil Practices & Remedies Code and much of the case law declare "truth" an affirmative defense to a defamation claim. In this case, the result is the same regardless of whether "truth" is an affirmative defense or merely negates the essential element of "falsity."

as to the gist of the defamatory charge are undisputed, then we can disregard any variance with respect to items of secondary importance and determine substantial truth as a matter of law. *Id.* "It is not the function of the court to serve as senior editor to determine if the reporting is absolutely, literally true; substantial truth is sufficient." *San Antonio Express News v. Dracos,* 922 S.W.2d 242, 249 (Tex.App.—San Antonio 1996, no writ) (quoting *Wavell v. Caller–Times Publishing Co.,* 809 S.W.2d 633, 636 (Tex.App.—Corpus Christi 1991, writ denied)).

In *McIlvain,* the manager of the City of Houston Water Maintenance Department brought a libel suit against several media defendants for airing a certain news broadcast. *Id.* at 15. That broadcast reported allegations by employees of the city water maintenance division that four employees were used on city time to care for the manager's elderly father and do other tasks around the manager's house. *Id.* The broadcast also reported that these employees then put in for overtime so they could get their city jobs done. *Id.* The broadcast further reported that the Public Integrity Review Group ("PIRG") was conducting an investigation into the matter and information about the alleged theft of City time might be turned over to a grand jury. *Id.* at 15–16. The trial court granted summary judgment for the defendants. *Id.* at 15.

On appeal, this court, with one justice dissenting, reversed the summary judgment, holding that a question of fact existed as to whether the statements contained in the report were defamatory. *Jacobs v. McIlvain,* 759 S.W.2d 467, 469 (Tex.App.—Houston [14th Dist.] 1988), *rev'd,* 794 S.W.2d 14 (Tex. 1990). Although it noted that the summary judgment proof "did not show that the underlying charges were true as a matter of law," the court expressly rejected the defendants' contention that they could publish potentially defamatory statements merely because there were charges made. *Id.* at 469. The court stated, "merely alleging that an investigation was in progress does not entitle a journalist to publish free-standing allegations . . . ." According to the court, "it is no

defense to say, 'it is alleged that . . . .' " The Texas Supreme Court reversed this court, finding that "a comparison of the contents of the broadcast and the PIRG report demonstrates that the broadcast was substantially correct, accurate and not misleading." *Id.* at 16. The court concluded "[the defendants have] established the substantial truth of the broadcast as a matter of law, thus negating an essential element of [the plaintiff's] cause of action." *Id.*

■ Because the Supreme Court compared some of the investigation's findings with the alleged defamatory broadcast, Felder argues that *McIlvain* requires not only the fact of an investigation be true, but also that the allegations under investigation be proven true. We disagree. Based on our reading of both the Supreme Court and appellate court opinions, we are convinced that when, as in this case, the report is merely that allegations were made and they were under investigation, *McIlvain* only requires proof that allegations were in fact made and under investigation in order to prove substantial truth. Otherwise, the media would be subject to potential liability everytime it reported an investigation of alleged misconduct or wrongdoing by a private person, public official, or public figure. Such allegations would never be reported by the media for fear an investigation or other proceeding might later prove the allegations untrue, thereby subjecting the media to suit for defamation. Furthermore, when would an allegation be proven true or untrue for purposes of defamation? After an investigation? After a court trial? After an appeal? Undoubtedly, the volume of litigation and concomitant chilling effect on the media under such circumstances would be incalculable. First Amendment considerations aside, common sense does not dictate any conclusion other than the one we reach today.

■ Here, the gist of the alleged defamation, as taken from statements in the Broadcast itself, is as follows:

(1) Dowling Middle School, which has a history of discipline problems is once again in the middle of a controversy.

(2) A group of parents, including the PTA President, is charging a school teacher

with physically threatening and verbally abusing their kids.

(3) Those are the allegations against Dowling Middle School teacher Bettye Felder, whom we couldn't reach for comment today.

(4) The administration is determined to reassign this individual temporarily under the supervision of the area superintendent, certainly pending the outcome of the investigation.

The truth of the facts asserted in these statements is conclusively established by uncontroverted summary judgment proof. First, Felder admitted in her deposition she was aware of other discipline problems at Dowling that had attracted media attention. Similarly, Principal Gardner admitted that when he first came to Dowling, he was aware of parents' concern about problems there and that these problems had received media attention. He added he was aware of public controversy surrounding Dowling and noted the allegations against Felder were not the first time that parents expressed concern about "things going on there." Newspaper articles further document prior media attention, both positive and negative, to past discipline and personnel problems at Dowling.

Second, the HISD report unquestionably shows parents at Dowling Middle School had alleged physical threats and verbal abuse by Felder toward their children. That these allegations were made was confirmed by Superintendent Drayton and Principal Gardner in their depositions. PTA President Mildred Burnley testified by affidavit that she was contacted on January 6, 1994, by one of the parents about "allegations that Felder was threatening and verbally abusing Dowling students." Ms. Burnley confirmed the statement attributed to her in the Broadcast was in fact made by her and she believed it to be true and accurate. While the parents quoted in the Broadcast did not express their comments as allegations, those comments were explicitly characterized as such by reporter Minerva Perez in the Broadcast.

Third, Perez's uncontroverted affidavit and deposition testimony establish she tried several times to contact Felder for comment on January 6, 1994, but those efforts failed primarily because it was against HISD policy to give out information on its personnel. Perez's testimony is supported by the affidavit of HISD spokesperson Jaime De La Isla. While the name of Felder's husband is listed in the telephone directory, Perez testified she never met Felder and "did not know anything about her." This testimony was not disputed. Lastly, Mr. De La Isla confirmed he made the statement attributed to him in the Broadcast and believed it to be true and accurate. Mr. De La Isla also testified HISD's standard policy was to temporarily reassign teachers pending an investigation into allegations of physical or verbal abuse or other improprieties. Superintendent Drayton testified Felder was in fact reassigned around the time of the January 5, 1994, suspension hearing.

In summary, the Broadcast reported that Dowling Middle School, which had a history of discipline and personnel problems, was embroiled in another controversy in which parents alleged physical threats and verbal abuse by teacher Bettye Felder, who was reassigned pending the HISD investigation. This was substantially, if not literally, true. Therefore, the Broadcast could not, as a matter of law, have been any more damaging to Felder's reputation in the mind of the average listener than absolutely truthful statements. *See McIlvain*, 794 S.W.2d at 16. Accordingly, the trial court erred in denying summary judgment for KTRK on the basis of substantial truth. Points one and two are sustained. Hence, we need not address points of error three through seven concerning actual malice and privilege.

## C. Other Claims

In addition to her defamation claim, Felder asserted causes of action for false light invasion of privacy, negligence, and intentional infliction of emotional distress. Felder claimed the allegedly false and defamatory statements "exposed her to financial injury" as well as "public hatred and ridicule" and she "suffered irreparable harm to her reputation" and severe emotional distress. Similarly, Houston Resource asserted causes of action for business disparagement, injurious falsehood, and tortious interference with a

business relationship.[3] Houston Resource claimed it "suffered severe and extreme realized pecuniary loss" as a result of the allegedly false and disparaging statements.

While raised as KTRK's tenth point of error, the parties acknowledge the tort of false light invasion of privacy is not recognized in Texas. *See Cain v. Hearst Corp.*, 878 S.W.2d 577, 580–81 (Tex.1994). This point is therefore sustained. In points of error eight and eleven through thirteen, KTRK essentially contends the remaining claims are indistinguishable from Felder's defamation claim and must therefore fail. We agree. Each of the those claims was based on allegedly false and defamatory or disparaging statements made about Felder in the Broadcast. In other words, those claims were grounded entirely on Felder's defamation claim. Because we have determined the Broadcast was substantially true as a matter of law and KTRK was entitled to summary judgment on Felder's defamation claim, we hold Felder and Houston Resource are also precluded from recovering on their other claims as a matter of law, and the trial court erred in not granting summary judgment in favor of KTRK on those claims. *See Rogers v. Dallas Morning News, Inc.*, 889 S.W.2d 467, 474 (Tex.App.—Dallas 1994, writ denied) (holding that plaintiff was precluded from recovering on non-libel claims where such claims were all grounded on plaintiff's libel cause of action and where summary judgment proof conclusively showed alleged defamatory articles were substantially true).

Because we hold the Broadcast was substantially true, we sustain points of error eight and eleven through thirteen. Accordingly, we need not address KTRK's ninth point of error contending that Felder was not entitled to recovery for intentional infliction of emotional distress because KTRK's conduct was not "outrageous" as a matter of law.

### D. KTRK's Objections To The Summary Judgment Proof

KTRK's fourteenth point of error complains of the court's decision to overrule only some of its objections. Felder argues KTRK cannot complain about the trial court's ruling because the court was without authority to rule on them in the first place. Accordingly, Felder and Houston Resource have filed a motion to strike certain exhibits attached to KTRK's brief. Specifically, Felder moves to strike: (1) a copy of the court's rulings on KTRK's objections, (2) a copy of an unpublished appellate court opinion granting mandamus relief where the trial court refused to rule on a media defendant's pending summary judgment motion, and (3) a transcription of a state Senate hearing on interlocutory appeals in media defamation cases.

We need not rule on the motion to strike nor address the issues raised by it because, even if we were to disregard the court's ruling on KTRK's objections and the exhibits attached to KTRK's brief, KTRK would still be entitled to summary judgment for the reasons stated above. Accordingly, we reverse the order of the trial court denying summary judgment to KTRK, and render judgment that Felder and Houston Resource take nothing.

---

**3.** Although alleged as separate torts, "business disparagement is actually a species of 'injurious falsehood.' " *See Gulf Atlantic Life Ins. Co. v. Hurlbut*, 696 S.W.2d 83, 96 (Tex.App.—Dallas 1985), *rev'd on other grounds*, 749 S.W.2d 762, 766 (Tex.1987). "The Restatement identifies the tort [of business disparagement] by the name 'injurious falsehood' and notes its application 'in cases of the disparagement of property in land, chattels, or intangible things or of their quality.' " 749 S.W.2d at 766 (quoting Restatement (Second) of Torts § 623A cmt.a (1977)).