# IN THE SUPREME COURT OF TEXAS

════════════
No. 11-0228
════════════

BYRON D. NEELY, INDIVIDUALLY AND BYRON D. NEELY, M.D., P.A.,
PETITIONERS,

v.

NANCI WILSON, CBS STATIONS GROUP OF TEXAS, L.P., D/B/A KEYE-TV, AND
VIACOM, INC., RESPONDENTS

════════════════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS
════════════════════════════════════════════════════════

CHIEF JUSTICE JEFFERSON, joined by JUSTICE GREEN and JUSTICE LEHRMANN, dissenting.

The Court holds that the broadcast presented a false impression, an untenable "gist," that the doctor was disciplined for operating on patients while taking dangerous drugs. But that gist is reasonably derived from the medical board's findings, the doctor's testimony, and witness observations. If the news report is damning, it is because it conveys substantial truth. The doctor performed brain surgeries during a time he was ingesting seven narcotics, eight other medications, and alcohol. He suffered hand tremors during the period he operated on patients' brains. The medical board investigator concluded that the doctor was subject to discipline based on his "[i]nability to practice medicine with reasonable skill and safety because of illness or substance abuse." The board not only suspended his medical license, but also ordered a psychiatric evaluation

focused on addictive disorders. It required the doctor to undergo a physical examination to confirm whether he was, or was not, physically capable of operating safely.

The doctor denies he was an addict or that his drug use impaired his surgical skills. That is enough, the Court says, to raise a genuine issue on the broadcast's substantial truth. But that evidence is immaterial to the gist the Court has identified: that the Board disciplined the doctor for taking dangerous drugs during a time he performed sensitive surgeries. Because "the underlying facts as to the gist of [that] charge are undisputed, . . . we can disregard any variance with respect to items of secondary importance and determine substantial truth as a matter of law." *McIlvain v. Jacobs*, 794 S.W.2d 14, 16 (Tex. 1990).

We must decide whether the broadcast was more damaging to the doctor's reputation, in the mind of an average viewer, than a truthful statement would have been. *Id*. Here, the literal truth is as caustic as the gist, and the gist reasonably depicts literal truth. Whether it rejected the doctor's gist contention, or found that the broadcast was substantially true, the trial court properly granted summary judgment. The court of appeals properly affirmed that judgment. I would also affirm. The Court's conclusion to the contrary sanctions constitutionally protected speech. For these and other reasons, I respectfully dissent.

## I.    The broadcast was substantially true.

"The common law of libel . . . . overlooks minor inaccuracies and concentrates upon substantial truth." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516 (1991) (internal citations omitted). Small discrepancies "do not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge be justified.'" *Id*. at 517; *see also Turner v. KTRK Television, Inc.*,

38 S.W.3d 103, 115 (Tex. 2000) (holding that substantial truth doctrine "precludes liability for a publication that correctly conveys a story's 'gist' or 'sting' although erring in the details"). "Put another way, the statement is not considered false unless it 'would have a different effect on the mind of the reader from that which the pleaded truth would have produced.'" *Masson*, 501 U.S. at 517 (quoting R. SACK, LIBEL, SLANDER, AND RELATED PROBLEMS 138 (1980)).

We must view the communication as a whole in light of the surrounding circumstances based upon how a person of ordinary intelligence would perceive it. *Turner*, 38 S.W.3d at 114. We determine falsity based on "the meaning a reasonable person would attribute to a publication, and *not to a technical analysis of each statement*." *New Times, Inc. v. Isaacks*, 146 S.W.3d 144, 154 (Tex. 2004) (emphasis added). Rather than consider the broadcast as a whole, the Court parses it into several different gists, and then addresses only two of them, ironically presenting a certain juxtaposition that the Court itself decries.

The Court states that the broadcast incorrectly characterized Neely's sanction as based on the Board's conclusion that Neely operated on patients while using dangerous drugs. ___ S.W.3d at ___. Because the Board's action was based only on self-prescribing, the Court holds that this gist was not substantially true.

We require substantial, not perfect, truth. With respect to substantiality, Neely admits he was using every one of the fifteen drugs identified in the Board order, plus a few more[1]:

Q.    And—and these are actually drugs that you were, I assume, taking. Correct?

A.    Yes, sir.

---

[1] Neely also admits taking Paxil, Flovent, and Singulair.

3

Q.    I mean, you weren't prescribing them to yourself to throw away, correct?

A.    No.[2]

Seven of these drugs are narcotics. Paregoric, a narcotic also known as camphorated tincture of opium,[3] contains morphine and is a controlled substance. The average adult dose is 5-10 milliliters one to four times per day; Neely concedes he was taking up to 70 milliliters daily. During 1999-2000 (the time of the Jetton and Wu surgeries), he took it regularly, at bedtime and again upon waking. He believes the effects wore off after two or three hours, and he believes he could perform surgery within three or four hours of taking morphine.

Neely tore his rotator cuff in 1999, and he admits during that time to taking "quite a bit" of Vicodin, also a narcotic and a controlled substance. He prescribed himself Darvocet, a pain medication, narcotic, and controlled substance; Darvon, Propoxyphene, and Norco, also narcotic pain relievers; Lomotil, another narcotic; Phenergan, an anti-nausea drug that can cause considerable drowsiness; Ventolin, a bronchodilator; Medrol and Azmacort, steroid treatments he used for asthma; Prilosec for acid indigestion; and Flonase. He was also taking Paxil, which his doctor had prescribed for acute depression.

Neely's self-refills were not isolated occurrences. Between August and October 1999—the time he was treating Paul Jetton—Neely self-refilled his Paregoric prescription twelve times.

---

[2] Unless otherwise indicated, all of this information comes from the Board's investigation, the Board's order, or Neely's testimony. The Board's order is attached as an Appendix to this opinion.

[3] *See, e.g., Henley v. State*, 387 S.W.2d 877, 878 (Tex. Crim. App. 1965) (holding that paregoric "is, in fact, a narcotic drug known under the official drug name of 'camphorated tinture [sic] of opium' and that it contains morphine, which comes from opium").

4

During the same time, Neely drank alcohol every night that he was not on call. He admits to two drinks per night during 1999-2001, although he would sometimes have four or five at a time and would occasionally "overindulge." Neely admits that almost all of the drugs he was using, including alcohol, can cause withdrawal symptoms, although he denies any such symptoms, except with regard to Medrol. Neely also acknowledges that the drugs he was using can cause dizziness, visual disturbances, mental cloudiness, euphoria, sedation, and nervousness. Neely admits he was hypomanic, which he defines as "hyperactive," while on steroids, as he was in 1999. When the broadcast aired, Neely had been involved in seven malpractice cases, at least two of which alleged that he was addicted to prescription drugs and that he abused alcohol.

The Court emphasizes that the Board found that most of Neely's drugs were "legitimately and appropriately prescribed." ___ S.W.3d at ___. In fact, the Board found that Neely's treating physician appropriately prescribed the medications *initially*, but it did not conclude that Neely's extensive (and unmonitored) refills were part of a legitimate treatment plan:

> Respondent's *treating physician* legitimately and appropriately prescribed a number of medications to treat these conditions. However, between 1999 and 2002, Respondent began to refill the medications himself in lieu of scheduled visits.

Agreed Order, Finding of Fact 6 (emphasis added). The Board's investigator concluded that Neely should be disciplined for "[i]nability to practice medicine with reasonable skill and safety because of illness or substance abuse." The Board ordered Neely not to prescribe or "*administer . . .* controlled substances or dangerous drugs with addictive potential or potential for abuse" to himself. (Emphasis added.) The Board required Neely to undergo an examination by a psychiatrist who was board-certified in forensic or addiction psychiatry. That directive cannot seriously be thought to relate

5

to mental health issues unconnected to drug use. *See* TEX. OCC. CODE § 164.056(d) ("The board may not require a physician . . . to submit to an examination by a physician having a specialty specified by the board unless medically indicated."). It can only relate to a determination that the doctor was actually taking these drugs and could be addicted to them. It is not hard to understand the Board's concerns: patient safety may be negatively impacted by a doctor performing surgeries while under the influence of, or experiencing withdrawal from, narcotics. The Board's requirement that Neely undergo a physical examination could only relate to the Board's fear that Neely had a condition that may adversely affect his ability to safely practice medicine.

The Court concludes that the Board's reference to Neely's "inability to practice medicine with reasonable skill and safety to patients, due to mental or physical condition" related only to Neely's hand tremors, and not his drug use. ___ S.W.3d at ___ ("The Board Order ultimately did not discipline Neely under section 164.051(a)(4) for substance abuse but only for a 'mental or physical condition,' which was his hand tremor."). But there is nothing in the Board's order reflecting such a determination. To the contrary, the Order states that "the Board is requesting independent *physical and psychiatric evaluations to determine [Neely's] capacity to practice medicine in general, and specifically, to perform surgery*." (Emphasis added.) Although the physical examination would address the Board's concerns about the hand tremors, the psychiatric evaluation, by a board-certified addiction specialist, could only have been intended to address the Board's concerns about Neely's possible substance abuse. We are supposed to view the communication as a whole in light of the surrounding circumstances based upon how a person of ordinary intelligence would perceive it.

6

*Turner*, 38 S.W.3d at 114. No reasonable person would interpret the Board's order the way the Court has.

After Neely and the Board signed the Agreed Order, the Board posted the following on its website:

> ON 12-12-03 THE BOARD AND DR. NEELY ENTERED INTO AN AGREED ORDER SUSPENDING THE PHYSICIAN'S LICENSE; STAYING THE SUSPENSION, AND PLACING THE PHYSICIAN ON PROBATION FOR THREE YEARS. THIS ACTION WAS BASED ON ALLEGATIONS THAT DR. NEELY HAD SELF-PRESCRIBED MEDICATIONS WITH THE POTENTIAL TO INTERFERE WITH HIS ABILITY TO PERFORM SURGERY. THE TERMS OF THE ORDER FORBID DR. NEELY FROM SELF-PRESCRIBING MEDICATIONS, AND REQUIRE CONTINUING PHYSICAL AND PSYCHIATRIC EVALUATIONS TO VERIFY HIS FITNESS TO PERFORM SURGERY.

Shortly thereafter, and a month before the KEYE-TV broadcast, the Austin American Statesman reported on the Board's actions, noting that Neely was one of six physicians disciplined for "violations involving either drug or alcohol abuse."[4] *See* Mary Ann Roser, *6 physicians disciplined for substance abuse*, AUSTIN AMERICAN STATESMAN, Dec. 20, 2003.

The court of appeals accurately assessed the substantial truth of the "taking dangerous drugs" gist:

> Neely's use of self-prescribed medications was plainly a focus of the Board's order. The order prohibited Neely from prescribing, dispensing, or administering "controlled substances or dangerous drugs with addictive potential or potential for abuse" to himself. Furthermore, the order was consistent with a concern of the Board that Neely might have become addicted to medications he was self-administering. The order required him to be evaluated by a Board-appointed psychiatrist who was board-certified in forensic or addictive psychology. These evaluations had not yet been performed, or the underlying issues resolved, at the time of the broadcast. In short,

---

[4] The Board suspension also led Blue Cross Blue Shield to deny Neely's request to participate in their PPO, POF, and HMO networks.

7

even if it was not literally true that Neely had been "disciplined for . . . taking dangerous drugs" in terms of the precise legal bases of the Board's order, that assertion would at least be substantially true because it would be no more damaging to Neely's reputation in the eyes of the ordinary viewer than a literally true recitation of the Board's order would have been.

331 S.W.3d at 924.

The Court reaches the opposite conclusion, isolating three portions of the broadcast: anchor Fred Cantu's introductory statement that Neely was disciplined for taking dangerous drugs and controlled substances, Paul Jetton's statement that one cannot take the medications Neely was taking and drive a vehicle, and Wilson's questioning of the Texas Medical Board representative regarding whether the order would prevent Neely from using dangerous drugs and controlled substances and thereby "do the same thing he was doing before." ___ S.W.3d ___.

But the Court's focus on a small portion of Cantu's introductory statement[5] is misplaced—even Neely admits that it was substantially true:

Q. We'll call this paragraph one. You can read it to yourself.

A. Yes.

Q. Is there anything in there that—that's false about you in there?

A. That's—that's fairly true.

The Court then turns to Paul Jetton's statement and concludes that "Paul's statement that one cannot take the medications Neely was 'taking' and drive a vehicle" contributed to the false gist. ___ S.W.3d at ___. But this conflicts with the Court's later holding that some of Sheila Jetton's

_____

[5] Fred Cantu: If you needed surgery would you want to know if your surgeon had been disciplined for prescribing himself and taking dangerous drugs, had a history of hand tremors and had been sued several times for malpractice in the last few years?

8

statements were protected by the judicial proceedings privilege. Specifically, the Court identifies a second gist involving Sheila Jetton's statements that Neely performed unnecessary surgery. The Court decides that those statements were protected because "an ordinary viewer could conclude that Sheila's allegation regarding unnecessary surgery was made in the Jetton lawsuit." ___ S.W.3d at ___. I do not understand why this holding would not also apply to Paul Jetton's statements about Neely's drug use, which formed the basis of the same lawsuit. His petition, filed nine months before the broadcast, alleged:

> At all time [sic] material hereto, Byron Neely, M.D. was impaired from making good medical decisions and from performing neurosurgery because he was dependent on steroids and opiates and that he abused alcohol. Byron Neely, M.D. knew that he was not competent to perform neurosurgery because he had tremors in his hands as a result of the drugs that he was taking. *By providing medical treatment to Paul Jetton and surgery on Paul Jetton in an impaired state, Byron Neely, M.D. acted negligently and such negligence was a proximate cause of the complained of damages. Such impairment adversely affected Byron Neely, M.D.'s communication skills and attentiveness to Paul Jetton's infected shunt.*

(Emphasis added.)

But even if Paul's statement were not privileged, Neely acknowledges its factual truth: you should not drive a car after you've taken Vicodin, Darvocet, Paregoric, Phenergan, or Norco. Neely agrees that these drugs impact physical and mental abilities, and that a surgeon should not perform surgery after taking these drugs. He also confirms that he was taking all of them, although he denies that he operated while impaired.

Finally, Neely admits that Jetton's statement was his opinion, and nothing more:

Q.     Now, this is Mr. Jetton's statement, right?

A.     That is correct.

9

Q.      And these are his views or opinions about some of the drugs that you were
        self-prescribing, right?

. . .

A.      That's his opinion.

*See, e.g., Greenbelt Coop. Publ'g Ass'n, Inc. v. Bresler*, 398 U.S. 6, 14 (1970) (holding that article

reporting that people had characterized a real estate developer's position as "blackmail" was protected

expression; "even the most careless reader must have perceived that the word was no more than

rhetorical hyperbole, a vigorous epithet used by those who considered [the developer's] negotiating

position extremely unreasonable"); *see also* ROBERT D. SACK, SACK ON DEFAMATION: LIBEL,

SLANDER, AND RELATED PROBLEMS § 4:2.4[A] (4th ed. 2012)(noting that the Supreme Court has held

that speech is not defamatory even if "literally containing assertions of fact [but] is intended to

express only points of view").

The Court concludes that Wilson's questioning of the Board representative also contributed

to the false perception that Neely was disciplined for operating on patients while using dangerous

drugs. The disputed excerpt provides:

| | |
|---|---|
| Wilson: | The [Board] did discipline Dr. Neely. This past December, they suspended his license but gave it right back by staying the suspension. Now he's on probation for three years. The only requirements are that he see a psychiatrist and not write prescriptions for himself or his family. A decision the Board defends. |
| Board representative: | We have compliance officers and the compliance officers will definitely follow to make sure that he's doing the things that his order requires him to do. |

10

| Wilson: | But how would they know if he's using? He can get somebody else to prescribe him. I mean, he could say, "I've followed the order." |
|---|---|

Board representative: Right.

| Wilson | I didn't prescribe myself. |
|---|---|

| Board representative: | Right, Right. |
|---|---|

| Wilson: | How do we, how do we know that he's, that we're not putting somebody right back out there to do the same thing he was doing before? |
|---|---|

| Board representative: | That's a very good question, and why this order doesn't include drug testing, I, I honestly don't know the answer to that. |
|---|---|

Wilson is not suggesting that the Board disciplined Neely for taking dangerous drugs, but rather that the Board did not do enough—that in the face of knowledge that a surgeon had hand tremors and had repeatedly self-prescribed numerous narcotics and controlled substances, the Board let Neely operate without requiring him to undergo drug testing. When asked whether Wilson's final question was true, Neely's response was not that her inquiries created the false impression that the Board had sanctioned him for using drugs, but that the Board would be able to obtain his medical and drug records to determine whether his confessed usage had ceased.

> Q. And then Nanci Wilson's asking about: "How would they know if he was using? He can get somebody else to prescribe for him. He could say I followed the order, and I didn't prescribe myself. How do you know that we are not putting somebody right back out there to do the same thing that he was doing before?" Do you see that?
>
> A. I see that, yes.
>
> Q. Is there anything false in there about you, in there?

. . .

A.  You know, how would he know? They have the—the—they have the medical records and the drug records from, henceforth.

Q.  And so you think that they would know from the drug records?

A.  Absolutely.

Finally, the Court concludes that it need not address the third gist it identifies: that Neely was operating on patients while experiencing hand tremors. ___ S.W.3d at ___. But we must evaluate the substantial truth of the broadcast as a whole,[6] and the hand tremors are an inseparable part. That portion of the broadcast is also undeniably true.

Neely has tremors, although he denies that they impact his surgical skills. He has variously ascribed the tremors to (1) tapering off of Medrol (which occurred when he treated Jetton and Wu, and he admitted some of those tremors were "major"); (2) the Ventolin he was taking; (3) nervousness while meeting with a Board investigator; and (4) being "badgered" by the attorney deposing him. The Board's investigator witnessed the tremors, as did Sheila Jetton when Neely was injecting anesthetic into her husband's head.[7] The Board's order concluded that Neely had a history of tremors, and Neely's personal physician noted it in his medical records. The Board was concerned enough about the tremors that it ordered Neely to undergo a complete examination by a physician "to determine [Neely's] capacity to practice medicine in general, and specifically, to perform surgery."

---

[6] *See City of Keller v. Wilson*, 168 S.W.3d 802, 811 (Tex. 2005) ("[P]ublications alleged to be defamatory must be viewed as a whole—including accompanying statements, headlines, pictures, and the general tenor and reputation of the source itself. A court reviewing legal sufficiency cannot disregard parts of a publication, considering only false statements to support a plaintiff's verdict or only true ones to support a defense verdict.").

[7] The Jettons fired Neely the next day.

12

The tremors, whether related to Neely's drug use or not, raise separate questions about Neely's fitness to perform surgeries. They formed part of the basis for the Board complaint and subsequent order, as well as the Jettons' lawsuit. We cannot consider the broadcast as a whole without including this portion of it.

The Court concludes that Neely has raised a fact issue on falsity because he denies operating while impaired and because the physician he hired after the Board instituted proceedings against him found that Neely did not have a substance abuse disorder. But Neely's controverting evidence goes to whether he was impaired or an addict, *not to whether the Board disciplined him for taking dangerous drugs during a time he was performing brain surgeries*.

A case from the United States Court of Appeals for the Seventh Circuit is instructive. *See Global Relief Found., Inc. v. New York Times Co.*, 390 F.3d 973 (7th Cir. 2004). Global Relief Foundation, Inc., an Illinois charity, sued several media defendants, alleging that news reports after the September 11, 2001 terror attacks falsely suggested that Global Relief had funded terrorism. *Id*. at 974-75. Global Relief complained that donations to the organization evaporated following these reports. *Id*. at 980-81. The media defendants moved for summary judgment, arguing that their reports were substantially true recitations of the government's suspicions about and actions against Global Relief. *Id*.

Global Relief opposed the motion and provided two affidavits, one from its executive director and another from its lead lawyer. *Id*. at 982-83. The executive director's affidavit denied that Global Relief engaged in violence or supported violence, terrorism, or military operations; he also denied that Global Relief ever provided weapons or military items to anyone or that it had provided humanitarian

13

aid to the families of suicide bombers. *Id*. at 983. Global Relief argued that this affidavit raised a fact issue, making summary judgment improper. *Id*.

Even in light of this evidence, the Seventh Circuit held that summary judgment was appropriate because the news reports were substantially true. *Id*. at 990. Although the executive director's affidavit "demonstrates a genuine issue on whether [Global Relief] has ever funded terrorist activity[, t]hat genuine issue . . . may not be material or relevant if the true gist or sting of the publications was not that [Global Relief] funded terrorism but that the government was investigating [Global Relief] for ties to terrorism and was considering blocking the group's assets." *Id*. at 983. The court ultimately concluded that Global Relief's evidence did not raise a fact issue on the substantial truth of the story's gist, which was the latter, and it affirmed summary judgment in the defendants' favor. *Id*. at 990. The court rejected Global Relief's "argument that these media defendants must be able to prove the truth of the government's charges before reporting on the investigation itself." *Id*. at 987. The court concluded that "[t]he fact of the investigation was true whether or not it was publicly known. That is all the defendants need to show for the defense of substantial truth. This they have done." *Id*. at 989.

The same applies to Neely's controverting evidence. Taking all of it as true, it demonstrates only a genuine issue on whether he was in fact impaired. That is immaterial to the story's gist: that the Board disciplined Neely for operating on patients while taking dangerous drugs. That gist was substantially true as a matter of law.

We come, then, to the literal truth. Even without reference to "gist," we know that the Board disciplined Neely for prescribing dangerous drugs to himself, drugs he admits taking. We know that

14

the Board ordered that Neely be supervised as a result. We know that Neely had hand tremors during a period of time in which he performed sensitive surgeries. The Board ordered psychiatric and physical evaluations that could only be tied to a concern for the safety of patients under Neely's care. We know that several of those patients experienced bad outcomes after Neely operated on them. We know that he had been involved in seven malpractice cases, at least two of which alleged that he was dependent on alcohol and drugs. These facts are not gist, only truth. Because the broadcast did not create a different effect on the average viewer's mind than the truth would have, I would hold that it is substantially true. *Masson*, 501 U.S. at 516; *Turner*, 38 S.W.3d at 114-15. I would go further. The "gist" that bothers the Court is actually an inference reasonably drawn from uncontested facts. The broadcast neither presents an inaccurate gist nor distorts the substantial truth.

## II.      Because the broadcast was substantially true, we need not revisit *McIlvain*.

The Court suggests that *McIlvain* stands only for the proposition that a broadcast's report of allegations are protected if those allegations are later proved to be true. ___ S.W.3d at ___. The Court rejects several Texas appellate courts' and the United States Court of Appeals for the Fifth Circuit's interpretation of *McIlvain*—that when a report is merely that allegations were made and were under investigation, proof that allegations were in fact made and under investigation establishes the report's substantial truth.[8] I disagree with the Court's restrictive view of *McIlvain*. But even if that case's precise limits are unclear, the speech here would be protected under the general rules

---

[8] *See, e.g.*, *Green v. CBS Inc.*, 286 F.3d 281, 284 (5th Cir. 2002); *Cox Tex. Newspapers, L.P. v. Penick*, 219 S.W.3d 425, 443 (Tex. App.—Austin 2007, pet. denied); *Grotti v. Belo Corp.*, 188 S.W.3d 768, 771 (Tex. App.—Fort Worth 2006, pet. denied); *Associated Press v. Boyd*, No. 05-04-01172-CV, 2005 WL 1140369, at *3 (Tex. App.—Dallas May 16, 2005, no pet.); *UTV of San Antonio, Inc. v. Ardmore, Inc.*, 82 S.W.3d 609, 611-12 (Tex. App.—San Antonio 2002, no pet.); *KTRK Television v. Felder*, 950 S.W.2d 100, 105 (Tex. App.—Houston [14th Dist.] 1997, no writ).

15

protecting reports of investigations, such as Texas' fair report privilege. *See* TEX. CIV. PRAC. & REM.

CODE § 73.002(b)(1).[9]  As a leading treatise notes,

> News reports that an investigation is underway by the police, by prosecutors, by other law enforcement agencies, or by other officials are common. Publication of the details of such inquiries is similarly common. Arguably such a report is, in substance, an implied allegation of the wrongdoing being leveled against the subject of the investigation. Readers or hearers may certainly interpret it as such; if there were no such allegation, presumably there would be no such investigation. The issue then arises as to whether the republisher of the charges is responsible for the truth thereof, that is, if the person is not guilty of the charges being investigated, does he or she have a defamation action against the republisher? . . .
>
> *The law treats these accounts as reports of events, not as republications of allegations of wrongdoing, so that as a general matter, if there is in fact an investigation, the report of its existence is "true."* Investigations are often important governmental occurrences. Permitting lawsuits for accurate reports of such events would threaten to black out significant news. "Doubtlessly, it is painful to be cast before the public as the target of an investigation where later events point to baseless or vexatious charges. The greater wrong, however, would be to shroud in secrecy, for want of publication, the government's scrutiny of its citizens."

ROBERT D. SACK, SACK ON DEFAMATION: LIBEL, SLANDER, AND RELATED PROBLEMS § 7.3.5[C] (4th

ed. 2012) (emphasis added) (quoting *Sibley v. Holyoke Transcript-Telegram Publ'g Co.*, 461 N.E.2d

823, 826 (Mass. 1984)).  The report here presented a "fair abridgement" of the Medical Board

proceedings and the Jetton and Wu lawsuits, and I would conclude that it was privileged. *See*

RESTATEMENT (SECOND) OF TORTS § 611 (1977). Apart from the constitutional considerations raised

by restricting such speech, these are matters of public concern. *See N.Y. Times Co. v. Sullivan*, 376

U.S. 254, 270 (1964) (noting our "profound national commitment to the principle that debate on

---

[9] *See also* RESTATEMENT (SECOND) OF TORTS § 611 (1977) (noting that "[t]he publication of defamatory matter concerning another in a report of an official action or proceeding . . . is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported").

public issues should be uninhibited, robust, and wide-open"). Imposing liability for reporting on such issues will shield the truth, not expose it. As the *Felder* court noted:

> [T]he media would be subject to potential liability everytime [sic] it reported an investigation of alleged misconduct or wrongdoing by a private person, public official, or public figure. Such allegations would never be reported by the media for fear an investigation or other proceeding might later prove the allegations untrue, thereby subjecting the media to suit for defamation. Furthermore, when would an allegation be proven true or untrue for purposes of defamation? After an investigation? After a court trial? After an appeal? Undoubtedly, the volume of litigation and concomitant chilling effect on the media under such circumstances would be incalculable. First Amendment considerations aside, common sense does not dictate any conclusion other than the one we reach today.

*KTRK Television v. Felder*, 950 S.W.2d 100, 106 (Tex. App.—Houston [14th Dist.] 1997, no writ).

## III. Conclusion

The broadcast is damning because it raises questions about Neely's fitness as a surgeon. But it is also substantially true. The Court's holding abridges the freedom to report on a matter of public concern. In that respect, it collides violently with the First Amendment. *See Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222 (7th Cir. 1993) ("The rule making substantial truth a complete defense and the constitutional limitations on defamation suits coincide."). I would answer anchor Fred Cantu's initial question in the broadcast "Yes." *See supra*, note 5. I respectfully dissent.

_____
Wallace B. Jefferson
Chief Justice

**OPINION DELIVERED:** June 28, 2013

17

APPENDIX

LICENSE NO. D9588

IN THE MATTER OF

THE COMPLAINT AGAINST

BYRON DAVIS NEELY, M.D.

BEFORE THE

TEXAS STATE BOARD OF

MEDICAL EXAMINERS

## AGREED ORDER

On the ___12___ day of ___December___, 2003, came on to be heard before the Texas State Board of Medical Examiners ("the Board" or "the Texas Board"), duly in session, the matter of the license of BYRON DAVIS NEELY, M.D. ("Respondent").

On August 22, 2003, Respondent appeared in person and with counsels, Dan Ballard and Stacey J. Simmons, at an Informal Show Compliance Proceeding and Settlement Conference in response to a letter of invitation from the staff of the Board. Walter Mosher represented Board Staff. The Board's Representatives were David E. Garza, D.O., a member of the Board, and Kevin R. Smith, M.D., a member of the District Review Committee.

Upon the recommendation of the Board's Representatives and with the consent of Respondent, the Board makes the following Findings of Fact and Conclusions of Law and enters this Agreed Order.

## FINDINGS OF FACT

The Board finds that:

1. Respondent received all notice required by law. All jurisdictional requirements have been satisfied. Respondent waives any defect in notice and any further right to notice or hearing under TEX. OCC. CODE ANN. Title 3, Subtitle B (Vernon's 2002) (the "Act") or the Rules of the Board.

2. Respondent currently holds Texas Medical License No. D9588. Respondent was originally issued this license to practice medicine in Texas on August 21, 1972. Respondent is also licensed to practice in Colorado.

3. Respondent is primarily engaged in the practice of Neurological Surgery. Respondent is Board Certified by the American Board of Neurological Surgery.

4. Respondent is 57 years of age.

5. Respondent has not previously been the subject of disciplinary action by the Board.

6. Respondent suffered various injuries and ailments, which required a variety of medications. Respondent's treating physician legitimately and appropriately prescribed a number of medications to treat these conditions. However, between 1999 and 2002, Respondent began to refill the medications himself in lieu of scheduled visits. The list of medications Respondent has self-prescribed include Hydrocodone, Soma, Darvocet, Paregoric, Propoxyphene, Carisoprodol, Medrol, Phenergan, Azmacort, Cardura, Prilosec, Lomotil, Ventolin, Norco, and Flonase.

7. Upon review of statements of Respondent and the September 27, 2000 medical records of Respondent obtained from his treating physician, the Panel concluded that Respondent had a prior history of tremors.

8. The Panel took notice of the fact that the Board's investigator claims to have witnessed a tremor during the 2002 interview. Respondent asserted the tremor was the result of nervousness about the interview.

9. Respondent presented evidence he has undergone a full physical examination by R. Russell Thomas, D.O., Board certified Family Practitioner. Dr. Thomas found Respondent to be in relatively good health, with no need of chronic medications. Dr. Thomas did not detect a medically significant tremor, however, felt unqualified to determine Respondent's ability to perform surgery, and recommended a disability assessment or a Neuro-psyche evaluation. Additionally, Respondent presented evidence of a psychiatric evaluation by Edgar Nance, M.D., Board certified Psychiatrist and Addictionologist to determine the possibility of substance abuse or addiction. Dr. Nance found no underlying psychiatric condition that would inhibit

Respondent's ability to practice medicine. The Board is requesting independent physical and psychiatric evaluations to determine Respondent's capacity to practice medicine in general, and specifically, to perform surgery.

10 Respondent has cooperated in the investigation of the allegations related to this Agreed Order. Respondent's cooperation, through consent to this Agreed Order, pursuant to the provisions of Section 164.002 of the Act, will save money and resources for the State of Texas. To avoid further investigation, hearings, and the expense and inconvenience of litigation, Respondent agrees to the entry of this Agreed Order and to comply with its terms and conditions.

## CONCLUSIONS OF LAW

Based on the above Findings of Fact, the Board concludes that:

1. The Board has jurisdiction over the subject matter and Respondent pursuant to the Act.

2. Respondent is subject to action by the Board under Sections 164.051(a)(4) and 164.056 of the Act due to Respondent's inability to practice medicine with reasonable skill and safety to patients, due to mental or physical condition.

3. Respondent is subject to disciplinary action pursuant to Section 164.051(a)(3) of the Act by committing a direct or indirect violation of a rule adopted under this Act, either as a principal, accessory, or accomplice, to wit, Board Rule 190.1(c)(1)(M) - inappropriate prescription of dangerous drugs or controlled substances to oneself, family members, or others in which there is a close personal relationship.

4. Section 164.001 of the Act authorizes the Board to impose a range of disciplinary actions against a person for violation of the Act or a Board rule. Such sanctions include: revocation, suspension, probation, public reprimand, limitation or restriction on practice, counseling or treatment, required educational or counseling programs, monitored practice, public service, and an administrative penalty.

5. Section 164.002(a) of the Act authorizes the Board to resolve and make a disposition of this matter through an Agreed Order.

6. Section 164.002(d) of the Act provides that this Agreed Order is a settlement agreement under the Texas Rules of Evidence for purposes of civil litigation.

## ORDER

Based on the above Findings of Fact and Conclusions of Law, the Board ORDERS that:

1. Based on the above Findings of Fact and Conclusions of Law, the Board ORDERS that Respondent's Texas license is hereby SUSPENDED; however, the suspension is STAYED and Respondent is placed on PROBATION under the following terms and conditions for 3 years from the date of the signing of this Order by the presiding officer of the Board:

2. Except as otherwise provided for by the terms of this Order, Respondent shall not treat or otherwise serve as a physician for Respondent 's immediate family, and Respondent shall not prescribe, dispense, administer or authorize controlled substances or dangerous drugs with addictive potential or potential for abuse to Respondent or Respondent's immediate family. Respondent may self-administer or administer to Respondent's immediate family only such drugs as prescribed by another physician for a legitimate medical purpose and in compliance with the orders and directions of such physician.

3. A psychiatrist board certified in forensic or addiction psychiatry shall be appointed by the Executive Director to serve as the evaluating psychiatrist. Within thirty (30) days of notification by the Director of Compliance of appointed evaluating psychiatrist, Respondent shall submit to and obtain a complete forensic evaluation from the approved evaluating psychiatrist.

The psychiatric evaluation will include at a minimum: social history and background information, history of present illness, mental status exam, review of records and other pertinent collateral information, DSM IV multiaxial diagnosis, and treatment recommendations. The Board and Respondent shall furnish a copy of this Order to the approved evaluating psychiatrist as authorization to make a full report to the Board regarding Respondent's evaluation and any

subsequent reports regarding Respondent's compliance with this Order. Respondent shall follow all recommendations made by the evaluating psychiatrist regarding continued care and treatment.

If the evaluating psychiatrist recommends continued psychiatric care and treatment, within thirty (30) days of that recommendation, Respondent shall submit in writing to the Director of Compliance of the Board, for approval by the Executive Director, the names of three (3) psychiatrists board certified in psychiatry to serve as the treating psychiatrist. Respondent may submit the name of his current treating psychiatrist. Respondent shall begin the recommended care and treatment with the approved treating psychiatrist within thirty (30) days of notification of approval by the Director of Compliance. The Board and Respondent shall furnish a copy of this Order to the approved treating psychiatrist as authorization for the treating psychiatrist to make reports to the evaluating psychiatrist regarding Respondent's compliance with the terms of this Order. Respondent shall follow all recommendations made by the treating psychiatrist regarding continued care and treatment.

During any continued care and treatment, Respondent shall be monitored for purposes of compliance with this Order. The evaluating forensic psychiatrist will monitor Respondent's treatment and rehabilitation, and provide progress reports to the Board every six (6) months. The reports are due on March 15 and September 15. The monitoring reports shall include current mental status examinations; pertinent history and social background information; progress with treatment and rehabilitation; and updated recommendations for Respondent's care. Respondent shall authorize the evaluating and treating psychiatrists to obtain any collateral information necessary for preparation of the monitoring reports from any third party, including the treating psychiatrist. The collateral information obtained shall be strictly limited to the minimum information necessary to ensure adequate assessment of Respondent's rehabilitation and compliance with the terms of this Order.

Board staff may furnish to each approved psychiatrist any Board information that it determines in its discretion may be helpful or required for the evaluation and treatment of Respondent.

Respondent's failure to cooperate with either approved psychiatrist or failure to follow the recommendations of either approved psychiatrist shall constitute a violation of this Order.

4. Within thirty (30) days of the signing of this Order by the presiding officer of the Board, Respondent shall undergo a complete examination by a physician approved in advance in writing by the Executive Director of the Board, and Respondent shall undergo continuing care and treatment by the approved physician for the treatment of any condition which, without adequate treatment, could adversely affect Respondent's ability to safely practice medicine.

Respondent shall authorize and request in writing that the approved physician provide written periodic reports no less than once each quarter during Respondent's treatment which reflect the status of Respondent's physical and mental condition, as well as Respondent's efforts at cooperation with treatment. Respondent shall authorize and request in writing that the approved physician provide such other written or oral reports as Board representatives and staff may request regarding Respondent's care and treatment within seven (7) days of the request. Respondent shall follow all recommendations of the approved physician to the extent that the recommendations are consistent with the terms of this Order as determined by the Board. Respondent shall not unilaterally withdraw from treatment, and shall request and authorize in writing that the approved physician report to the Board within forty-eight (48) hours any unilateral withdrawal from treatment by Respondent. Respondent shall provide a copy of this Order to the approved physician as a reference for evaluation and treatment, and as authorization for the physician to provide to the Board any and all records and reports related to the evaluation and treatment conducted pursuant to this paragraph. Upon request, Respondent shall execute any and all releases for medical records necessary to effectuate the provisions of this paragraph and this Order.

5. The time period of this Order shall be tolled if (a) Respondent subsequently resides or practices outside the State of Texas, (b) Respondent subsequently is in official retired status with the Board, (c) Respondent's license is subsequently cancelled for nonpayment of licensure fees, or (d) this Order is stayed or enjoined by Court Order. If Respondent leaves Texas to live or practice elsewhere, Respondent shall immediately notify the Board in writing of the dates of Respondent's departure from and subsequent return to Texas. When the period of tolling ends, Respondent shall be required to comply with the terms of this Order for the period of time remaining on the Order. Respondent shall pay all fees for reinstatement or renewal of a license covering the period of tolling.

6. Respondent shall comply with all the provisions of the Act and other statutes regulating the Respondent's practice.

7. Respondent shall fully cooperate with the Board and the Board staff, including Board attorneys, investigators, compliance officers, consultants, and other employees or agents of the Board in any way involved in investigation, review, or monitoring associated with Respondent's compliance with this Order. Failure to fully cooperate shall constitute a violation of this order and a basis for disciplinary action against Respondent pursuant to the Act.

8. Respondent shall inform the Board in writing of any change of Respondent's mailing or practice address within ten days of the address change. This information shall be submitted to the Permits Department and the Director of Compliance for the Board. Failure to provide such information in a timely manner shall constitute a basis for disciplinary action by the Board against Respondent pursuant to the Act.

9. Any violation of the terms, conditions, or requirements of this Order by Respondent shall constitute unprofessional conduct likely to deceive or defraud the public, and to injure the public, and shall constitute a basis for disciplinary action by the Board against Respondent pursuant to the Act.

10. Respondent is permitted to supervise physician assistants, advanced nurse practitioners, and surgical assistance.

11. The above-referenced conditions shall continue in full force and effect without opportunity for amendment, except for clear error in drafting, for 12 months following entry of this Order. If, after the passage of the 12-month period, Respondent wishes to seek amendment or termination of these conditions, Respondent may petition the Board in writing. The Board may inquire into the request, and may, in its sole discretion, grant or deny the petition without further appeal or review. Petitions for modifying or terminating may be filed only once a year thereafter.

RESPONDENT WAIVES ANY FURTHER HEARINGS OR APPEALS TO THE BOARD OR TO ANY COURT IN REGARD TO ALL TERMS AND CONDITIONS OF THIS AGREED ORDER. RESPONDENT AGREES THAT THIS IS A FINAL ORDER.

THIS ORDER IS A PUBLIC RECORD.

I, BYRON DAVIS NEELY, M.D., HAVE READ AND UNDERSTAND THE FOREGOING AGREED ORDER. I UNDERSTAND THAT BY SIGNING, I WAIVE CERTAIN RIGHTS. I SIGN IT VOLUNTARILY. I UNDERSTAND THIS AGREED ORDER CONTAINS THE ENTIRE AGREEMENT AND THERE IS NO OTHER AGREEMENT OF ANY KIND, VERBAL, WRITTEN OR OTHERWISE.

DATED: _____ 12/4 _____, 2003.


_____
BYRON DAVIS NEELY, M.D.
RESPONDENT

STATE OF _TEXAS_       §
                       §
COUNTY OF _TRAVIS_     §


SWORN TO AND ACKNOWLEDGED BEFORE ME, the undersigned Notary Public, on this _4th_ day of _December_, 2003.


_Hope Tello_
Signature of Notary Public


_HOPE TELLO_
Printed or typed name of Notary Public
My commission expires:
_6/10/2004_


SIGNED AND ENTERED by the presiding officer of the Texas State Board of Medical Examiners on this _12_ day of _December_, 2003.


Lee S. Anderson, M.D., President
TEXAS STATE BOARD OF MEDICAL EXAMINERS


STATE OF TEXAS
COUNTY OF TRAVIS

I, _Sally Durocher_, certify that I am an official assistant custodian of records for the Texas Medical Board, and that this is a true and correct Copy of the original, as it appears on file in this office.

Witness my official hand and seal of the Board, this _30th_ day of _JANUARY_, 20_08_.

Assistant Custodian of Records


Page 9 of 9